United States v. Rodriguez Good morning, Mr. Clue. I don't think I can come to Miami without seeing you. It's good to see you again this morning. Yesterday I saw Mr. Shurker, you know, it feels like a reunion where the pandemic must be over. It's good to see you. Mr. Shurker is one of the few people that makes me feel young. United States v. Rodriguez, I should say. Go ahead, Mr. Clue. Thank you, Your Honor. As the appellant, we feel that the issues really revolve around a record that is tainted by the Zoom proceeding in this case. Some of the core turning points in the case in the sentencing hearing occurred either when the defense counsel was offline, was not present for them, or could not reliably be participating. And that was not the only problem with the Zoom proceedings. At various times during the Zoom proceedings, the interpreter would say she couldn't hear the judge and the defense attorney wouldn't be seen on the screen. At various times, the defendant couldn't hear the judge. The judge says, well, it doesn't matter whether you hear me or see me. What matters is that you hear the interpreter. And I'm not sure that's correct either. So we take a case that has some problems. Not every Zoom proceeding went well during the pandemic. And this one did not go well. And it is important, before the sentencing hearing, although it's not clear that a formal objection was made during the sentencing hearing, in her motion to make additional— I don't see—there's not an objection, right? There's not an objection during the sentencing hearing. But in Documentary 50, the filing by the defense attorney was—said clearly to the court that she didn't see any possible way that this would reliably turn out well at Zoom because of the specifics of the defendant. She didn't know that there were going to be specific problems with Zoom at the time. But the defendant himself, which he characterized as having low intelligence and a difficulty understanding, she'd had difficulty with him because of the pandemic. They hadn't been able to get together. She alerted the court ahead of time. And thus, during the sentencing hearing, twice during the sentencing hearing, the judge gets to a point where he rules, we've got to stop this and we'll set it for another time. Yeah, the district court really tried to remedy the technical difficulties as they arose. And it seems to me that in a more than 50-page transcript, the problems really span two pages. And when you look at this under United States v. Roy, it seems to me—I'm not sure you've established that there was actual prejudice here. I think the key is, when you look at the government's brief, they say—they distinguish Roy by saying, well, the only thing that went wrong is when the district court began questioning the defendant without the presence of his attorney. Don't worry about that because he made exculpatory statements. And I think that's the key. If that is their defense, that has to be wrong. That does not distinguish Roy on its face, first of all. Second of all, these were not exculpatory statements. And this was the most important time in the whole case. The defendant had, of course, had a Fifth Amendment right. The judge was trying to elicit from counsel whether she would permit him to the defendant. At that point, she gets knocked off of the Zoom. The judge then goes ahead and starts questioning the defendant. The defendant does not make exculpatory statements. The defendant's statements then cause the judge to then turn sua sponte to the government and says, well, do you want to do something about this now? And the government says, well, yes, your honor, we want to withdraw our 5K motion. We want to withdraw our acceptance of responsibility. So this was a big turning point in the case. As to what effect it had later, did the district judge later say, well, I'm just going to write out the facts of the case? If that's true, then we have error in the other aspects of the rulings. If the judge said, well, I'm going to remedy in my own mind by saying I'm just going to kind of forget everything that happened and leave some parts in and leave some parts out. It makes it very difficult on appeal to say what the district court's relying on and not in terms of this very unusual variance, upward variance, for sentences of less than 25 days that occurred more than 20 or 25 years before the offense. Wasn't defense counsel able to rectify some of those issues, for instance, correct Rodriguez's statement and clarify that he had admitted that there were drugs in the house? Wasn't there some cleanup work done by defense counsel? There's cleanup work, but again, how it cleans it up is unclear because as we say in our brief, our principal argument on the drugs issue and the premises is what the judge says ultimately is, okay, I'm going to find if there are multiple drugs in the house, even though he's lived there for 20 years, then you have a premises enhancement. So it's possible the judge is trying to remedy in his own mind by collapsing the record into things that didn't happen at a certain point or just collapsing it down. But if that's what the premises enhancement, so one of the two has to be reversed in theory. One of the problems I've had, I take your point about the government's attempt to distinguish Roy in the sense that the way the district court was construing the testimony could have meant that your client would have lost an acceptance of responsibility reduction. But in the end, he got it, right? He got the reduction, right? He did. He did get the reduction. Okay. And again, I don't know how to evaluate it. In Roy, it's clearly inculpatory testimony. Here's an instance where it's sentencing and so he's denying. It's hard to say it's inculpatory, but on the other hand, if it's disbelieved, it could mean a loss of acceptance of responsibility. But in the end, he gets the reduction. And again, that's why the sort of the cliff way that this is looked at in terms of a critical stage denial of counsel. I'm compelled to say something dumb at this point, which is the famous expression about 90% of success is showing up. And with Zoom, that's about all you ever get is 90% when it goes perfectly. When it goes haywire, you get about 50% of the 90%. You don't really know. You have something of a temporal paradox once the defendant has already been questioned without the presence of counsel, without the ability to invoke his Fifth Amendment privilege, made statements that got the judge going in one direction. Then everything else that happens is some attempt to try to cure it. And the defendant's counsel still does not know what happened. She still does not know. She doesn't hear this stuff about the government withdrawing the 5K. But the district court told counsel what happened. He told him something about what the defendant said. But again, it's not a complete record of what's going on. She's not really showing up. And that's the thing. From my standpoint as a defense counsel, we urge the court to really consider how important it is and the reason why, if it is a critical stage. When the defendant without counsel is being questioned at sentencing about the most important things in the case, and after defendant counsel has not granted the court permission, despite the court's asking for permission, that makes it a critical stage. At that point under Roy, it does require reversal. Roy said it was seven minutes of repetitive, redundant testimony that was fully dealt with that didn't affect the case in any way over a very long period of trial. It just wasn't critical. This is the exact opposite. This is the heart and core of the case. And again, my original point, which is how the district court ultimately dealt with it, we don't know. But we do know that the findings that the court made really don't support either of these adverse enhancements. Finding that he's lived there for 20 years, we know he had multiple drugs in the house, therefore he gets supremacist enhancement. If the judge is doing that because of how he's collapsed the record, because of what transpired at Zoom, that's insufficient to support supremacist enhancement. If the judge also is collapsing, he's not, the issue of the aged convictions comes up again after allocution. It doesn't, there's no notice of it at all, no hint of it in the PSI. The PSI says there's no grounds for variance, no grounds for departure. It comes up afterwards and you have two accounted, they're just de minimis level convictions. And the court does not rely on the types of extra facts so that it's possible that, again, we can't rely on this particular proceeding for these particular results. With regard to the final issue of the supervised release, we urge the court to adopt the majority, what we think is the majority position in the circuits. Particularly in this case, because in this case, unlike some of these other decisions, you have an order that appears in a sort of faded out Xerox copy that is put on a website that is impossible to find through searching. You have to know about it. We get notice about it in this case in the red brief. That's how we got notice of that order. And so it's, the Fifth Circuit position, very moderate. If the court is not going to remand, we'd actually urge the Fourth Circuit position as a primary position, which is to remand for resentencing in light of the Zoom, but in light of what happened with the other, and in light of the other errors. If the court doesn't do that, we'd ask the court to adopt the Fifth Circuit position, which again, the Fifth Circuit in this case explained the Diggles decision, which the government had relied on extensively in their brief to show that this is not a plain error and that clearly, given the statutory purpose and the requirement of the exercise of discretion and the need for the showing of the exercise of discretion, that that be an appropriate remedy. I don't think any other circuit, regardless, excuse me, regardless of which direction they went on that question, has relied on how easy or hard to find the standard conditions. Easy or hard it was to find the standard conditions. How, what do you think that, which way, why do you think that makes this case go in one direction rather than the other? Well, I think it certainly makes it less likely, again, in the context of this case. You have a Zoom hearing where you don't even have consultation during the Zoom hearing between counsel and defendant. Are you arguing, I guess, that it's as if there were no standard conditions, that these were all simply conditions that your client had no notice at all of, or is there some middle ground because they were out there but you didn't find them? There's something else out there. There's something missing at this point because what's, what comes out is the standard conditions, the court calls the standard conditions that he imposes, are not exact to what's in the administrative order. So I think there's something else out there. I don't know. It's impossible to find. We have this bleached out copy of a 1988 order that you have to, you have to know that it's there in order to find it. Then you have the standard conditions that are imposed that are unfavorable than the standard conditions. So yes, I think that that is an important factor here, Your Honor. Any other questions? Okay, thank you, Mr. Kluge. Mr. Keller? Good morning. May it please the court, my name is Zach Keller and I'm here on behalf of the United States. So nobody here and nobody there that day would call this a perfect sentencing. It wasn't, plain and simple. But the question today isn't whether it's a model, it's whether it's sufficient. And on the chronic standard issue, you know, the question is whether the disruptions here met the chronic standard and they don't. So to start to talk about the facts, and Chief Judge Pryor kind of got at this a little bit during the earlier questioning, we're talking about two transcript pages here, really less than two transcript pages here, of actual absence. And there, most of the questions, about half of that transcript was devoted to Mr. Rodriguez not being able to hear the judge. That's most of what they talked about. He actually only answered two questions and it was six transcript lines. And then at the end, and this is actually connecting it to Roy, what the judge did was, at first he said, well, we just need to do this in person. And the parties didn't really want to do that, clearly. So then what he did was, they re-litigated the issue, they kind of clarified it, they fixed it, they cleaned it up. And every other disruption that occurred during this hearing was the same. They cleaned it up, they waited, they figured out the technology, she eventually was on her phone. And didn't object. And did not object. And I think that that just reflects the fact that they all knew this was tough, but they all wanted to get through it. So then to talk about the law on this chronic issue, the standards are super high here, and they simply don't meet it. Under Roy and Stano, the burden is a very heavy one for any, for chronic error to be found, and only a very narrow spectrum of cases find it to apply. Folks talk about clearing hurdles for multi-factor tests, but this is more like pole vaulting. They got two of them, they got to clear, and they really don't get close to either. The first is that it's got to be for a critical stage. And, you know, respectfully, with respect to what my opposing counsel said here, I don't think this was a critical stage, because, and Roy says this, when we refer to stages, we do not mean fleeting moments, or small parts of a proceeding. It's established that a sentencing hearing in whole, or in total, is the critical stage. But here, there wasn't a critical stage that there was an absence. And the absence also wasn't complete. So that's the second prong you need to meet. Instead, like I said earlier, every time that they, you know, had an issue, they backed it up, they cleaned it up, and they fixed it. So, you know, whereas my opposing counsel talked about... Your opposing counsel suggested there is no way to fix it, because the judge already knows what they know, even once you clean it up. What's your response to that? I would say that the judge, and this kind of gets back to the idea of a turning point, that this was the turning point in the hearing, that there was no turn, going back to the fact that he didn't lose the enhancement. The judge could have said, I'm just going to take... You mean the reduction? The reduction, yes, sir. The judge could have said, well, I'm just going to take what he said, and we're just going to take it, and that's going to be it. But he didn't. He gave the defense counsel an opportunity to, you know, talk about the issue, to say, what do we mean by manufacturing? Maybe he meant something different. And then they ended up being able to clean it up and settle the issue. And that's why they were able to go all the way through. What the guidelines range was finally after the process, before the judge selected the actual sentence? So, he never changed the guidelines range. It was, I believe, 46 to 57 months. And what was the actual sentence chosen? So, what he did was, he initially moved upward to 60 months, and then he departed downward to 50 months. So, it was actually... And that's a point he kind of made during this, is even though that I'm going outside the range initially, my sentence is actually within the guidelines range here. So, if there are no more questions about the chronic issue, I can move to the supervised release. And here, whether the supervised release order was sufficient really boils down to whether the Southern District's default release conditions were implied when the judge ordered supervised release. So, where are these conditions? And how hard do you think it is to find them? They're on the website. As far as how hard they are to find them, we're lawyers. We have to dig through things sometimes. There's no doubt, to the point that it's in the brief, it's not easy to find. It's not a header that's on the website. At the same time, it's there in the administrative orders. So, again, what we do as lawyers, we often have to slog through some things. So, it's there, and it's been there for 33 years. So, our position is that any defense lawyer who's working in this district should know that there's a standing order and that there are set supervised release conditions. And again, in the standing order, it says, are hereby imposed. So, it's not like a recommendation. Wouldn't it be more, set aside whether it ultimately makes a difference, but wouldn't it be more fair to make those a little bit more obvious? Not everyone will have a defense lawyer who's been practicing in the district for 30 years. Well, again, I think this gets back to the issue of whether this is a model situation or perfect situation. Would it be great if they had them as a banner on the website? Absolutely. That's something that could be fixed pretty soon, right? They could fix it whenever they wanted to, but I think the issue is just, again, we're talking about sufficient here. So, we're talking about, is it something that means that the judge, I mean, you look at this sentencing transcript, and they went through it. And then you ask yourself, do we really need them to go do it again? Or even have a remand about these sentencing conditions? And again, I think our position is just that we wouldn't want that to turn on how difficult it is to find something in a website when lawyers, our job is to find things on websites, to find things in Lexis, et cetera. I mean, back to Judge Grant's point, though, it'd be very easy to say, for the judge to say, I incorporate the standing order. It would be. I think the issue, though, again, is getting back to anything in isolation might be simple. So, going through the 3553 factors at sentencing is simple. Asking if there are any objections to the sentence, the way it was imposed, et cetera, at the end of sentencing is simple. But it's just a question of, are we going to pile more things into what judges have to do at sentencing? And I don't disagree that- One odd thing is, though, the conditions imposed are not identical to those in the standing order. That's correct. So, I mean, that makes it a little bit tricky to argue that everyone should know that these are out there when maybe, maybe not. It'll be exactly the same, but you'll still characterize it as the conditions in the standing order. Well, I think that the issue, again, comes back to notice. I mean, the reason that we're talking about this issue is as a Fifth Amendment due process issue. That the idea is a defendant should be able to defend against whatever it is that we're talking about. And here we're talking about the supervised release conditions. And I agree with you that they're not identical, but they're substantially similar. And the only area where they deviate is something that's  So, again, if you just play this out as a lawyer, they're looking at the standing order, they're looking at the standard conditions in the sentencing guidelines, and they're looking at the 3583 mandatory conditions. So, those are what's informing the lawyer saying, here's what we should be expecting. Here's what we're on notice to argue against. If there are no more questions on that issue, I'd move to the sentencing enhancement, which my opponent talked about a little bit. And our position on this issue is that it fails because of something that I think we all learned in March 2020, which is that we might have been living in our houses for 10 years, for 15 years, for 20 years, but then all of a sudden it got a new principal purpose, which was for us to work. And the judge in this case, he's factoring in the fact that there's all this evidence of the manufacturing over the course of these six months, and he says, if this had just been a one-time thing, then maybe it wouldn't have applied. But again, he looked at all the facts, he took in the case law, which says, you know, there can be more than one primary purpose, and that's the decision he reached. If there are any more questions? We don't. If there's nothing else, then I would just yield back my time and ask the court to affirm the district court. Thank you, Mr. Keller. Mr. Kluge, you have five minutes. Thank you, Your Honor. I think turning back to Roy and the critical stage issue, if in Roy, when Ms. Pugliese and Ms. Litwin, the defendant's attorneys had left the courtroom and couldn't get back in for seven minutes, and Judge Moore had said, okay, and now we're going to go ahead and call the defendant to the stand and I'm going to ask him some questions. I don't think the case would have even gone on back. I think there would have been no question that that's a critical stage. You have a defendant with a Fifth Amendment right, you have a Judge sua sponte eliciting his testimony, and the counsel is not present. Citing Roy does not help the government in this case because the very narrow way the court looked at it in Roy simply doesn't apply here. Now, the question is, oh, well, maybe it was cured. Cure is not really part of the analysis. It was in Roy. There was inculpatory testimony. It was taken in the absence of defense counsel, and part of the analysis in Roy was the same testimony was taken again with defense counsel present without objection. Yes, this is adverse testimony, but there's things that can't be cured here which include the deprivation of the Fifth Amendment right not to incriminate yourself, the deprivation of the right to have an advice of the right not to incriminate yourself before you're called as a witness, the right to have a counsel consult with you regarding the making of that decision. From the defense side, there is such a different look in terms of the outcomes. Everything we're looking about is process, and the belief, it may be mythical, the belief that if you are counsel and you are there, you can actually influence the course of what the defendant's doing. It doesn't always work, and you can help him to make a correct decision about the exercise of constitutional rights. The problem I have is that it seems that you've offered a reason in your brief, and you've mentioned it today. It's plausible to me, but it's one that didn't pan out, and that is given what the defendant said, he might have lost his acceptance of responsibility, but he didn't. Well, but he did get upwardly varied on to 25-year-old misdemeanor level. It's a reduction, right? Back within the guideline range. Yes, to a sentence. Again, we're talking about a sentence that is... I don't see how you tie that though, Mr. Clu, all of that. I mean, the acceptance issue I get, but he didn't, but he got the reduction. Right. Well, the issue, there's two components. It wasn't just acceptance. Why do you think that whatever he said in those six lines on the two pages has had anything to do with the upward variance? How could I find that? Two components. It wasn't just acceptance. The first thing was the 5K. So we don't know what effect it had on the 5K. The judge, the government immediately says, again, outside the presence of defense counsel, we want to withdraw our 5K. We want to deny acceptance of responsibility. The 5K ends up, the government ultimately goes ahead with its recommendation. The judge imposes 20 to 25% higher than what the government recommended in terms of a sentence. The government recommended a below guideline sentence. Judge imposes a middle of the recalculated guideline sentence. Again, the, and again, I don't believe the government has, when the government talks about the basis for the judge's rulings on these two enhancements, the variance enhancement and the premises enhancement, the judge, it only says because there's multiple drugs there. That's true in COVID. People did a lot more things in their house. But again, there's so many more factors to consider in whether a house is principally being used for, or centrally being used for drugs. We had essentially a two month period where there's, it's unclear exactly what was being done at that house or how many people were being used in there. What the guidelines talk about is either a house or a room. They're talking about something's really set aside for the business. And this is, when the agents go there, when they actually go into the house, there's some pills there. That's true. But there's not, there's no manufacturing operation there going on at all. Regarding the supervisory, if I could just touch on that really quickly, the way I can explain how we don't, we didn't know, I've been practicing in one way or another here since 1979. The way I can explain why we didn't know about this administrative work, Judge King in the 80s never let anybody see his signature. You would always have it blanked out. I was supposed to clerk for Judge King and I ended up clerking for Judge Spellman instead in 1980. So I mean, I'm very familiar with some of his habits and you couldn't see his signature. So when I saw this order for the first time on appeal, I thought to myself, is this real? Because it's got Judge King's signature on it. This is not something that people knew about. And so it's hidden. It's there. It's not even, I don't think the judges know about it. I think the judges are relying on the form that comes, that they're signing, which is different than that. And I think the court should correct it. The Fifth Circuit's remedy is eminently reasonable. Thank you, Ron. Thank you, Mr. Kluge. We'll move to the third case.